| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------X<br>KATHLEEN SHEEHAN,<br><br>        Plaintiff,<br><br>       -against-<br><br>WNYC Radio,<br><br>        Defendant.<br>------------------------------------------------------------X | **AMENDED COMPLAINT**<br><br>06 Civ. 13421<br><br>Judge Rakoff<br>Magistrate Judge<br><br>**Plaintiff Requests Trial By Jury**<br><br>ECF Case |

Plaintiff **KATHLEEN SHEEHAN** alleges that:

## FIRST CLAIM
(Retaliation in violation of Title VII and the ADEA)

1. The jurisdiction of this Court is conferred because of the presence of:

(a) federal questions pursuant to 28 U.S.C. §§1331 and 1343 arising from claims based upon the Age Discrimination in Employment Act of 1967 (ADEA), 82 Stat. 602, as amended, 29 U.S.C. §621 *et seq*., and Title VII of the Civil Rights Act of 1964, §§701 *et seq*., as amended 24 U.S.C. §2000e, *et seq*.; and

(b) the presence of a common nucleus of operative fact such that a single case or controversy is present for supplemental jurisdiction pursuant to 28 U.S.C. §1367.

2. The venue of this action is properly placed in the Southern District of New York pursuant to 28 U.S.C. §1391(c) because WNYC Radio ("WNYC") conducts business in the Southern District of New York, and the facts out of which the claims arose occurred in the Southern District of New York.

**Background**

3. Plaintiff Kathleen Sheehan ("Sheehan") is a resident of the State of New York, residing at 24 East 93rd Street, Apt 4B, New York, NY 10128.

4. Sheehan is a 40-year-old female.

5. Upon information and belief, WNYC is a not for profit corporation incorporated under the laws of the State of New York.

6. WNYC employed Sheehan as an underwriting manager in the corporate underwriting department at its main office, located at One Centre Street, New York, NY 10007.

7. WNYC employed Sheehan commencing approximately September 26, 2005 until her termination on October 25, 2006 (Sheehan's "period of employment").

8. WNYC employed Sheehan on a salary and commission basis—with a base salary of $55,000 plus commission of fourteen percent of the first new business order for a particular client, eleven percent of the second new business order from that client, and five percent of the third new business order and each new business order thereafter from the same client.

**WNYC managers' discriminatory behavior toward Sheehan**

9. Vince Gardino ("Gardino"), Executive Director of Corporate Underwriting at WNYC frequently invites female employees of WNYC to dine and drink at WNYC's expense at Keens Steakhouse, but rarely extends such an invitation to male employees.

10. In September 2005, Gardino required Sheehan to attend a lunch meeting at Keens Steakhouse, which was paid for by WNYC.

11. At the lunch meeting, Gardino repeatedly insisted that Sheehan drink alcohol.

12. Sheehan refused Gardino's request three times.

13. Despite Sheehan's refusal to drink alcohol at the meeting, Gardino said "you gotta take a sip," which she refused to do.

14. In September 2005, at a client dinner, Gardino commented that Sheehan probably "used to be a wild one" earlier in her life.

15. Prior to Sheehan's refusal to drink with Gardino, Gardino promised that Sheehan would be assigned active clients and new business leads, and that Sheehan would take over a former underwriting manager's budget and clients.

16. Because of her refusal to drink with Gardino, Sheehan was never assigned these clients and leads.

17. After Sheehan refused to drink with Gardino, he stopped giving her sales leads and forbade her to contact advertising agencies.

18. Instead, Gardino gave the leads to female underwriting employees who went out drinking with him.

19. Female underwriters Paula Gill and Barbara Paone, for example, were treated with favor, given leads, and assigned to advertising agencies after submitting to Gardino's requests to "go drinking."

20. In addition, after Sheehan's refusal to drink, Gardino removed clients that had previously been assigned to Sheehan—including Zenith, Berlex Labs, Working Today Magazine, Brooklyn College, the American Symphony Orchestra, and the agency Media & Entertainment Strategies.

21. As an underwriting manager, Sheehan relied on leads to find new clients, and her compensation and her career at WNYC were based on attracting new clients.

22. Without leads and without contacting advertising agencies, it was nearly impossible for Sheehan to meet the goals established by WNYC.

23. As such, Gardino created a condition of employment where women must drink with him in order to succeed as underwriters at WNYC.

24. Gardino frequently verbally abused Sheehan in the presence of WNYC clients and employees.

25. For example, Gardino called Sheehan a "pain in the ass" in front of clients at a client meeting.

26. Mark Siegel ("Siegel"), Associate Director of Underwriting at WNYC, also frequently verbally abused Sheehan in the presence of clients and employees.

27. For example, on November 21, 2005, Siegel yelled at Sheehan loudly while pounding his fist on a desk.

28. Siegel left the door to the office open so his shouts were heard by several other employees.

29. On November 21, 2005, Sheehan phoned Cindy Prater ("Prater"), Director of Human Resources at WNYC, to make a formal complaint about the hostile work environment created by Gardino's and Siegel's constant verbal abuse of Sheehan (the "November 21 complaint").

30. After the November 21 complaint, Gardino began giving the sales leads which should have gone to Sheehan to a 26-year old male without experience who frequently goes out drinking with Gardino.

31. Prater discussed Sheehan's November 21 complaint with Gardino and Siegel, and with Phil Redo ("Redo"), Vice President of Strategy and Operations at WNYC.

32. Thereafter, Gardino and Siegel apologized to Sheehan.

33. On November 30, 2005, Sheehan met with Prater, Gardino, Siegel, and Redo to discuss the behavior of managers toward Sheehan and Sheehan's role at WNYC (the "November 30 meeting").

34. At the November 30 meeting, Sheehan was instructed to focus on real estate, health care, financial services, and wine/alcohol.

35. At the November 30 meeting, Sheehan was instructed not to contact culture, film, and legal businesses or Fortune 50 companies.

36. By letter of December 5, 2005 (the "December 5 letter"), Prater informed Sheehan that the investigation of her complaint was concluded, but Prater never supplied Sheehan with the write-up of the investigation Prater had promised.

37. In the December 5 letter, Prater stated that Sheehan's concerns "sounded more like an issue of management style."

38. The leads given to Sheehan effectively ceased after December 5, 2005.

39. On June 5, 2006, Sheehan filed a second formal complaint with Prater regarding Gardino's insistence that female employees drink with him and the retaliation that Sheehan suffered as a result of her refusal to drink with Gardino (the "June 5 complaint").

40. On August 11, 2006, Sheehan filed a charge of discrimination based on retaliation, gender discrimination, and age discrimination with the U.S. Equal Employment Opportunity Commission (E.E.O.C.).

41. Sheehan received notification of her right to sue WNYC from the E.E.O.C. on August 25, 2006.

42. On September 11, 2006, Prater responded by letter to Sheehan's June 5 complaint—concluding that gender-based discrimination had not occurred.

43. On August 18, 2006, Sheehan submitted a letter to Laura Walker ("Walker"), President and CEO of WNYC, summarizing her complaints regarding Gardino and attaching a copy of her E.E.O.C. charge of discrimination.

**WNYC's termination of Sheehan's employment.**

44. On September 12, 2006, Gardino conducted a performance review of Sheehan (the "performance review").

45. In the performance review, Gardino stated that Sheehan did not meet the goals of achieving an annualized budget of $600,000, attracting 50 percent new business, and obtaining new accounts in certain categories, although Sheehan was subsequently informed that her annual budget goal was $461,520.

46. The performance review also alleged that Sheehan needed to improve proficiency with the Marketron system, improve interpersonal skill and communication with co-workers, and adhere to WNYC and management direction and policy.

47. On September 28, 2006, a meeting regarding the performance review was attended by Sheehan, Prater, Gardino, and Siegel (the "September 28 meeting").

48. During the September 28 meeting, Sheehan was placed on final warning, effective immediately.

49. On October 4, 2006, Sheehan received a letter from Gardino confirming the final warning and stating its terms.

50. The final warning required that Sheehan improve the alleged deficiencies noted in her performance review within 30 calendar days of September 28 (the "30-day period") or face termination of her employment at WNYC.

51. The final warning required that Sheehan "make substantial progress" in the following areas during the 30-day period:

    (a)    Meet sales budgetary goals,

    (b)    Generate 50 percent new business,

    (c)    Adhere to management direction and policy,

    (d)    Adopt and execute WNYC sales practices,

    (e)    Improve communication and rapport with salespersons and support staff, and

    (f)    Become proficient in Marketron to the point where no errors occur such as double-booking.

52. On October 4, 2006, Sheehan submitted a letter to Gardino (the "October 4 letter") seeking clarification of several issues, including, *inter alia*:

    (a)    Whether other underwriting managers are subject to the same performance standard and review of Sheehan,

    (b)    Specific examples of employees or managers complaining about Sheehan's interpersonal style,

    (c)    Clarification of the budgetary goals she must meet to avoid termination,

    (d)    Whether WNYC followed company procedure in giving Sheehan 30 days notice,

    (e)    Specific information as to when double bookings occurred on the Marketron system, and

    (f)    The procedures for communicating with the office when Sheehan will be out of the office for sales calls, medical appointments, or for other reasons.

53. On October 10, 2006, Sheehan, Prater, Gardino and Siegel met to discuss Sheehan's October 4 letter (the "October 10 meeting").

54. Sheehan's budgetary goals, as established by Siegel and Gardino, were significantly higher than the goals established for other underwriting managers.

55. During the 30-day period, WNYC's inventory of advertising time was "sold out" for September, October and November.

56. The fact that this inventory was "sold out" substantially impeded Sheehan's ability to meet budgetary goals and generate 50 percent new business during the 30-day period, as clients rarely purchase advertising time more than a month in advance.

57. Sheehan had to turn down many client orders during the 30-day period due to the fact that inventory was "sold out" through November.

58. The fact that Sheehan was not allowed to directly contact agencies also substantially impaired her ability to meet budgetary goals and generate 50 percent new business during the 30-day period.

59. Sheehan adhered to management direction and policy and adopted and executed WNYC sales practices both before and during the 30-day period.

60. For example, Siegel alleged that Sheehan violated WNYC policies when she called in to Tai Clark ("Clark"), an assistant in the underwriting department, rather than speaking directly to Siegel or Gardino, to report that she would be out of the office for a doctor's appointment.

61. However, Sheehan was not aware of any WNYC policy or practice requiring her to speak directly to Siegel or Gardino regarding doctor's appointments.

8

62. Other WNYC employees frequently reported to Clark, rather than Siegel or Gardino, when taking time off for doctor's appointments.

63. Sheehan has no knowledge of which salespersons, if any, complained about her interpersonal style or communication style.

64. During the October 10 meeting, Sheehan asked Prater which employees had complained about her interpersonal style or communication style, but Prater refused to give any examples.

65. Sheehan did not make double-booking mistakes in the Marketron system before or during the 30-day period.

66. Tai Clark was largely responsible for entering orders into the Marketron system.

67. Clark often failed to complete Marketron entries and other paperwork despite numerous requests by Sheehan.

68. For example, in September 2006, Sheehan repeatedly asked Clark to complete the reports and books for clients including the New York Philharmonic and the 92nd Street Y.

69. Sheehan requested assistance from Siegel and Gardino in compelling Clark to complete the reports and books.

70. Despite Sheehan's numerous requests, the reports and books were not completed in a timely manner.

71. Employees frequently make double-booking mistakes on the Marketron system and are not disciplined for these mistakes.

72. At both the September 28 meeting and October 10 meeting, Gardino and Siegel accused Sheehan of attempting to convince Deutsche Bank to deal directly with Sheehan, rather than through an agency.

73. Sheehan did not try to convince Deutsche Bank to deal directly with her, rather than through an agency.

74. At both the September 28 meeting and October 10 meeting, Gardino and Siegel accused Sheehan of altering an Ameriprise presentation in another employee's folder.

75. This accusation was based on an electronic "footprint" that indicated Sheehan had accessed the Ameriprise presentation.

76. There was no indication that any actual changes were made to the Ameriprise presentation.

77. The Ameriprise presentation was a PowerPoint used in client meetings—which was created by simply adding the Ameriprise logo to a generic presentation containing information about WNYC.

78. Sheehan occasionally accessed PowerPoint files such as these in order to use the generic information as a template for a presentation to another client.

79. Sheehan does not recall whether she accessed the Ameriprise presentation.

80. In any event, Sheehan never made any changes to the Ameriprise presentation electronic file.

81. The following are examples of complaints Sheehan submitted during her period of employment regarding the discrimination she suffered at WNYC:

| Quote | To whom complaint submitted | Date |
|---|---|---|
| "Vincent Gardino has called me 'a pain in the ass' during a client meeting in front of the client." | Cindy Prater, HR Director at WNYC | 11/21/05 (verbal complaint) |
| "Mr. Gardino has pressured me to drink alcohol at dinners or events, even after I have said no." | Cindy Prater | 11/21/05 (verbal complaint) |
| "I am afraid to speak out for fear of retaliation." | Cindy Prater | 11/21/05 (verbal complaint) |
| "Within the first week of employment with WNYC, it became apparent to me that Mr. Gardino treats male employees of the underwriting department differently from female employees." | Cindy Prater; with "CC" to Laura Walker, President and CEO of WNYC | 06/05/06 |
| "In approximately September 2005, Mr. Gardino invited me to meet with him at Keens steakhouse. I agreed to the meeting under the assumption that Mr. Gardino wanted to discuss business matters. However, when I arrived at Keens, Mr. Gardino quickly pressured me to drink alcohol. I do not drink alcohol and refused his request three times. Despite my refusals, Mr. Gardino said, 'you gotta take a sip.'" | Cindy Prater, with CC to Laura Walker | 06/05/06 |
| "When I refused Mr. Gardino's invitations to 'go drinking' with him, he created a work environment that was nearly impossible for me to succeed." | Cindy Prater, with CC to Laura Walker | 06/05/06 |
| "After my refusal of Mr. Gardino's advances, I was instructed that I was not allowed to contact advertising agencies. With this limitation, it is nearly impossible for me to meet the goals set by WNYC management." | Cindy Prater, with CC to Laura Walker | 06/05/06 |
| "Mr. Gardino has created a condition of employment where women must drink with him in order to succeed within the department." | Cindy Prater, with CC to Laura Walker | 06/05/06 |
| "For the most part, Mr. Gardino does not invite men to dine and drink at the station's expense at Keens steakhouse as he does for the women of the department." | Cindy Prater, with CC to Laura Walker | 06/05/06 |
| "[O]nce I refused to drink and party with Vince Gardino, and to be the 'Wild One,' which he encouraged and suggested I was at some point in my life, my career opportunities [at WNYC] diminished." | Cindy Prater | 07/05/06 |

11

| | | |
|---|---|---|
| "Post my refusal [to drink with Gardino], Vince Gardino has removed clients he had assigned me including Berlex Labs and Working Today Magazine and gave them to Walter Mysholowsky.  Barbara Paone closed a few of the clients Vince Gardino assigned me including American Symphony Orchestra and Brooklyn College.  None of these clients have been replaced." | Cindy Prater | 07/05/06 |
| "In September 2005, Vince Gardino . . . insisted that I drink alcohol at a lunch meeting.  At a client dinner, he commented that I probably used to be a "wild one" earlier in my life.  After I refused to drink with him, Mr. Gardino stopped giving me sales leads and instead gave the leads to female underwriting employees who went out drinking with him." | E.E.O.C. | 08/11/06 |
| "I was also forbidden to contact advertising agencies—where one half of the business came from." | E.E.O.C | 08/11/06 |
| "Mr Gardino recently began giving many of these leads to a 26-year old male who frequently goes out drinking and partying with him, after I made a formal complaint against Mr. Gardino with the Human Resources department at WNYC." | E.E.O.C. | 08/11/06 |
| "Mr. Gardino also has called me "a pain in the ass" during a client meeting in front of a client, and has verbally abused me in front of other employees." | E.E.O.C | 08/11/06 |
| "I have on three occasions made written complaints to Human Resources about my supervisor, Vincent Gardino.  Mr. Gardino has given me no opportunity to succeed at WNYC—by cutting off all leads and access to agencies—after I refused to drink and 'party' with him in the fall of 2005." | Laura Walker, President and CEO of WNYC; with "CC" to Nicki Newman Tanner, Chair of WNYC Board of Trustees | 08/18/06 |
| "I have received no remedy to my complaints.  Thus, on August 11, I made a complaint to the U.S. E.E.O.C., and I write to you out of frustration." | Laura Walker with CC to Nicki Newman Tanner | 08/18/06 |
| "I cannot be productive in the short run and am severely handicapped in the long run-if I must develop corporate underwriting leads only through cold calls.  No one else in my department is so limited." | Laura Walker with CC to Nicki Newman Tanner | 08/18/06 |

| | | |
|---|---|---|
| "I have experienced increased retaliation following my EEOC complaint and posing a series of questions to Vincent Gardino seeking clarification in order to respond effectively to my performance review." | Cindy Prater | 10/19/06 |

82. On October 25, 2006, Sheehan informed a WNYC client that the client would pay lower rates for advertising if the client booked advertising directly with WNYC ("go direct") rather than going through an agency.

83. Gardino and Siegel encouraged underwriting managers, including Sheehan, to convince clients to go direct whenever possible.

84. On October 25, 2006, Prater told Sheehan to turn in her office key and go home, stating as a reason that Sheehan had encouraged the client to go direct.

85. On the next day, October 26, 2006, Prater sent Sheehan an email terminating her employment without explanation.

86. Sheehan adequately performed her job duties as an underwriting manager.

87. Sheehan possessed the qualifications necessary to her position as underwriting manager.

88. Thus, WNYC retaliated against Sheehan in violation of Title VII and the ADEA.

89. As a result of the foregoing, Sheehan suffered from stress, headaches, fainting, mood swings and severe menstrual cramps, causing her to consult with a psychiatrist and cognitive therapist and incurred approximately $10,000 in treatment costs.

90. By the reason of the foregoing, Sheehan is entitled to:

    (a)    Back pay, lost commissions due to access to clients being denied in retaliation for protected activity, commissions earned through the

       date of her dismissal, and restitution of fringe benefits in the amount of approximately $180,000; and

  (b)  Reinstatement, or, in the alternative, front pay including loss of future earnings, and retirement benefits; and

  (c)  Compensatory damages for pain and suffering and emotional distress and reimbursement for treatment costs in the amount of $300,000; and

  (d)  Punitive damages in the amount of $300,000; and

  (e)  The costs of this action, including fees and costs of experts, together with interest and attorney's fees; and

  (f)  Such other and further relief as this Court deems just and equitable.

## SECOND CLAIM
(Retaliation in violation of New York Human Rights Law)

91. Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

92. WNYC is liable to Sheehan for retaliation in violation of N.Y. Exec. Law § 296, *et seq.*

93. By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## THIRD CLAIM
(Retaliation in violation of the New York City Administrative Code)

94. Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

95. WNYC is liable to Sheehan for retaliation in violation of New York City Administrative Code Title 8, § 8-107 *et seq.*

96. This complaint has been served on the New York City Commission on Human Rights and on the Corporation Counsel for New York City as required by N.Y. Code §8-502(c).

97. By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## FOURTH CLAIM
(Gender discrimination in violation of Title VII)

98. Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

99. WNYC violated Title VII by discriminating against Sheehan with respect to her employment on the basis of her gender.

100. By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## FIFTH CLAIM
(Gender discrimination in violation of New York Human Rights Law)

101. Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

102. WNYC is liable to Sheehan for gender discrimination in violation of N.Y. Exec. Law § 296, *et seq*.

103. By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## SIXTH CLAIM
(Gender discrimination in violation of the New York City Administrative Code)

104. Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

105.    WNYC is liable to Sheehan for gender discrimination in violation of New York City Administrative Code Title 8, § 8-107, *et seq*.

106.    By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## SEVENTH CLAIM
(Age discrimination in violation the ADEA)

107.    Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

108.    WNYC violated the ADEA by directing leads that should have gone to Sheehan to a 26-year-old male employee.  .

109.    By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## EIGHTH CLAIM
(Age discrimination in violation of New York Human Rights Law)

110.    Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

111.    WNYC is liable to Sheehan for age discrimination in violation of N.Y. Exec. Law § 296, *et seq*.

112.    By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

## NINTH CLAIM
(Age discrimination in violation of the New York City Administrative Code)

113.    Sheehan repeats and re-alleges each and every allegation of paragraphs 1 through 89.

114.    WNYC is liable to Sheehan for age discrimination in violation of New York City Administrative Code Title 8, § 8-107, *et seq*.

115.    By reason of the foregoing, Sheehan is entitled to the relief set forth in paragraph 90.

**Wherefore**, it is respectfully requested that this Court award Sheehan the relief set forth in paragraph 90 of the complaint.

January 17, 2007

_____/s/_____
**PETER G. EIKENBERRY** (PGE-7257)
Attorney for plaintiff Kathleen Sheehan
74 Trinity Place, Suite 1609
New York, New York 10006
(212) 385-1050